UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
05-CV-1084(JMR/FLN)

In Re Possis Medical, Inc.,    )
Securities Litigation          )
_____)
                               )          ORDER
This document relates to:      )
     ALL ACTIONS               )

Plaintiffs seek to represent a class of stock purchasers of Possis Medical, Inc. ("Possis"). They have filed their consolidated amended class action lawsuit, alleging violations of the Securities Exchange Act of 1934. Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and in light of the heightened pleading standards mandated by Congress in the Private Securities Litigation Reform Act ("PSLRA"), and Fed. R. Civ. P. 9(b). Defendants' motion is granted.

I.  Background

Possis is a Minnesota-based corporation which develops, manufactures, and markets medical devices. Defendant Robert G. Dutcher ("Dutcher") is President, Chairman, and Chief Executive Officer of Possis. Defendant Eapen Chacko ("Chacko") was formerly its Chief Financial Officer. Possis' primary product is the AngioJet® Rheolytic™ Thrombectomy System ("AngioJet"), a non-surgical catheter system designed to rapidly remove blood clots with minimal vascular trauma. While Possis may manufacture and

sell more than a single product, all parties agree virtually all of Possis' revenue derives from the sale of the AngioJet System.

A.   The AiMI Study

On October 23, 2001, Possis announced a significant post-market clinical trial – the AiMI study – for the AngioJet.  This study compared heart attack victims treated with the AngioJet and other therapies, with other heart attack victims who were treated with those same methods, but without the AngioJet.  Had the study showed the AngioJet, coupled with other therapies, produced more favorable results for heart attack victims, the result would have obviously been very favorable for Possis.  Defendants expected positive results, and planned to use the study to market the AngioJet as a leading method and standard of care for removing blood clots in a broad range of heart attack patients.  Such a showing would have likely led to increased revenues for Possis.

The study, however, did not prove as positive as defendants had hoped.  It showed that, while the AngioJet was effective and safe, there was no basis to conclude the product should be routinely used in all heart attack patients.  When Possis released the study results on August 23, 2004, its share price dropped 38 percent, an $11.75 loss per share.

Plaintiffs claim defendants knew of the study's negative results prior to public release in August, 2004.  Plaintiffs' sole evidence in support of this contention is the testimony of three

unnamed former Possis employees.

The first unnamed source is a clinical representative who worked for Possis from April, 2002, to April, 2004.  According to this source:

> We were starting to get indications that the results weren't panning out the way we thought. . . .  I left in April [2004] and I was getting indications before April.  Just you hear rumbling in the cath lab, people talking. . . . They didn't think they were getting the results they wanted and they were also not getting the [patient] cases that they wanted. . . . [D]octors were not doing the study on patients that they really wanted to use the AngioJet on.

(Am. Compl. ¶ 67).

The second unnamed source is a former sales representative who worked for Possis for two years, ending in September, 2005.  This source stated:

> Those cases are gone over with a fine-tooth comb by the people over at Possis.  To think they didn't know that this thing was tending in a negative or neutral way.  They knew. They had to have known.  Anybody would know. . . . The majority of the hype was certainly in 2004, and I'm sure that they knew in the early to mid part of 2004.

(Am. Compl. ¶ 68).

Finally, the third unnamed source, a clinical specialist who was employed at Possis from November, 2003, until August, 2005, reported that "the AiMI data arrived at the corporate headquarters in or about May of 2004."  (Am. Compl. ¶ 83).

B.   <u>The Company's Public Statements</u>

Plaintiffs accuse defendants of knowingly issuing misleading communications regarding the success and prospects of the AiMI study on several occasions between January and August, 2004.  They claim defendants continued to tout the prospective expanded AngioJet revenues based on positive findings in the AiMI study, even though Possis knew the study would yield disappointing results.

1.   <u>Statements Issued Between January and April, 2004</u>

Plaintiffs point to a number of statements made by defendants between January and April, 2004, the time-frame during which plaintiffs' unnamed employees received negative "indications" regarding the study.  First, plaintiffs claim defendants wrongfully failed to revise a January, 2004, press release which projected revenues for the fiscal year.

Next, plaintiffs allege a February press release was false and misleading when it contained optimistic statements concerning earnings growth after a discussion of the AiMI study.  The February press release quoted Dutcher saying:

> In January 2004 the Company completed patient enrollment in its pioneering AiMI study involving the combined use of the AngioJet System and stents to treat heart attack victims.  Results from this groundbreaking study should be available this summer. . . .  We continue to invest in marketing, development, and strategic initiatives that should deliver strong earnings

> growth throughout the remainder of fiscal 2004
> and beyond.

(Am. Compl. ¶ 69.)

The Company's projected 2004 fiscal year revenues were in the range of $71-73 million, with net income per diluted share in the range of $0.58-$1.62.  <u>Id.</u>

Plaintiffs further claim John Riles, Possis' Director of Marketing, made false and misleading statements during a conference call on February 18, 2004, when discussing Possis' second quarter 2004 financial results.  He responded to an analyst's inquiry as to the potential impact of the AiMI study saying, "[the] patient subset will significantly allow us to expand our market opportunity. . . .  [T]he end result will . . . help strengthen the argument [for] using AngioJet."  (Am. Compl. ¶ 71).

Plaintiffs next claim Possis' March 15, 2004, 10-Q Securities and Exchange Commission ("SEC") filing was false and misleading. The form 10-Q signed by defendants Dutcher and Chacko attributed expected growth in AngioJet sales in part to the future publication of clinical data.  The company also reiterated the projections for fiscal year 2004 previously given in its February 17, 2004, press release.  (Am. Compl. ¶ 74).

 Finally, plaintiffs suggest a  Bloomberg interview published April 5, 2004, was misleading.  During that interview, defendant Dutcher said Possis' realizable AnjioJet market would nearly triple

in three years by "simply expanding the [AngioJet's] applications." (Am. Compl. ¶ 75.)   He also said scientific information from clinical trials was crucial to doctors gaining acceptance of the product.   <u>Id.</u>

   2.  <u>Statements Made Between May and August, 2004</u>

   Plaintiffs also claim two other statements -- made around May of 2004, when plaintiffs' unnamed witnesses claim Possis had received negative AiMI study results – were false and misleading. The first statement is contained in a May 18, 2004, press release announcing "record" sales, and a 60% increase in earnings per share for the third fiscal quarter of 2004.   The release quotes Dutcher who said, "[w]e expect to enter fiscal 2005 with . . . potentially promising results from our AiMI coronary marketing trial." (Am. Compl. ¶ 79.)   The release also announced 2005 fiscal year projected AngioJet revenue in the range of $90-$96 million, but stating "the upper end of the revenue range will require that the Company have compelling clinical results from its AiMI [clinical trial]."   <u>Id.</u>

   Plaintiffs, finally, point to the firm's June 14, 2004, SEC form 10-Q which projects the same increased revenue for fiscal 2005.  Here again, Possis stated that meeting "[t]he upper end of the range will require that findings of the Company's AiMI coronary clinical marketing trial . . . support increased utilization of the AngioJet System."   The form 10-Q estimated diluted earnings per

share in the range of $.083 to $0.96, with the qualification that "the upper end of the range [is] contingent on the impact of clinical results from AiMI.  The Company expects to refine its guidance for fiscal 2005 once it has fully analyzed and disclosed the AiMI results."  (Am. Compl. ¶ 81).

   C.  Stock Sales

   Plaintiffs claim defendants made "unusual and suspicious" stock sales which show defendants knew of the AiMI study's negative results prior to its public release in August, 2004.  While plaintiffs recognize many Possis insiders made multiple profitable stock sales during the Class Period, plaintiffs find it noteworthy that several members of Possis management sold stock between May 27 and June 1, 2004, within a week of the company's May press release.

   Plaintiffs point to sales by seven Possis "insiders" during that period, including sales by defendants Dutcher and Chacko. Chacko sold 4,000 shares on May 27 for approximately $113,640.  On June 1, plaintiffs claim Dutcher made his most profitable sale in eight years, selling 7,482 shares for approximately $212,040.  In all, the seven insiders sold a total of 53,367 shares of Possis stock for proceeds of approximately $1,506,159 over that six-day span.  (Am. Compl. ¶ 87).

   Plaintiffs claim the timing and magnitude of the stock sales is "powerful evidence of scienter."  According to plaintiffs, the sales were unusual and suspicious because the "collective selling

activity" which occurred during that short time-frame was "unprecedented." They further argue the timing of the sales is suspect because, according to one of plaintiffs' anonymous sources, the Company received the AiMI data around that time. (Am. Compl. ¶ 87).

II. <u>Discussion</u>

When enacting the PSLRA, Congress explicitly raised the previously-established standard required for a private securities plaintiff to survive a Rule 12(b)(6) motion. 15 U.S.C. § 78u-4(b); See <u>Florida State Bd. of Admin. v. Green Tree Fin. Corp.</u>, 270 F.3d 645, 660-61 (8th Cir. 2001). In order to sustain a securities fraud claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, plaintiffs must now show:

> (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security.

<u>In re K-Tel Int'l, Inc., Sec. Litig.</u>, 300 F.3d 881, 888 (8th Cir. 2002).

Applying the PSLRA standards, the Court finds plaintiffs have failed to produce those specific statements, facts, and indicia of knowledge which might show defendants engaged in misleading or fraudulent acts. Plaintiffs' pleadings are insufficient under prongs one and three. As such, they are unable to support the

conclusion that defendants' statements were false or misleading when made, or that defendants acted with scienter.

A. <u>False or Misleading When Made</u>

A party who seeks to maintain a securities fraud claim must first establish misrepresentations or omissions of material fact. 15 U.S.C. § 78u-4(b)(1). "[R]ote allegations that the defendants knowingly made false statements of material fact" do not satisfy the heightened pleading standards of the PSLRA. <u>In re Navarre Corp. Sec. Litig.</u>, 299 F.3d 735, 745 (8th Cir. 2002). The challenged statements must be pleaded with particularity, and plaintiffs must adduce facts sufficient to justify their belief that defendants' statements were misleading when made. <u>Id.</u> at 742. In practice, this means plaintiffs are required to plead the "who, what, where, when and how" of the alleged misleading or fraudulent statements. <u>K-Tel</u>, 300 F.3d at 890.

The Court discerns three problems in plaintiffs' allegations of false or misleading statements. First, the anonymous sources relied upon by plaintiffs do not meet the established standards for such sources. Second, because plaintiffs have failed to spell out the who, what, when, where, why, and how of the alleged fraud, there is precious little upon which the Court can find the statements were false or misleading when made. Third, the statements are immaterial as a matter of law under the bespeaks caution doctrine and the PSLRA's safe harbor provision.

1.   <u>Anonymous Sources</u>

Plaintiffs rely on the statements of three anonymous sources as the sole support of their assertion that defendants knew the study's results prior to August, 2004.

Courts are understandably wary of "testimony" by unidentified "witnesses." <u>See</u> <u>In re Cabletron Sys., Inc.</u>, 311 F.3d 11, 29 (1st Cir. 2002).  As a result, unnamed sources must be "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." <u>Novak v. Kasaks</u>, 216 F.3d 300, 314 (2d Cir. 2000).  Plaintiffs have utterly failed to provide this information.

The Amended Complaint alludes to a "clinical representative," and ascribes to this person "rumbling[s] in the cath lab, people talking" and "indications" before April, 2004.  From this, the unnamed source claims to perceive that the AiMI study results "weren't panning out the way we thought," because "doctors were not doing the study on patients that they really wanted to use the AngioJet on."  (Am. Compl. ¶ 67.)  But plaintiffs have failed to indicate the source of the "indications" and "rumblings;" thus, there is no way to know whether the information from this anonymous source is based on firsthand knowledge or unsupported rumor.  <u>See</u> <u>California Pub. Employees' Retirement Sys. v. Chubb Corp.</u>, 394 F.3d 126, 148 (3d Cir. 2004).  In addition, even if this scuttlebutt was circulating in the cath lab, it is impossible to conclude that

Possis' high ranking officers, including Dutcher and Chacko, were aware of these "indications" and "rumblings."

The second source is identified as a "former sales representative" who claimed "they had to have known . . . in early to mid 2004 . . . that this thing was tending in a negative or neutral way" because the cases were "gone over with a fine-tooth comb by the people over at Possis." (Am. Compl. ¶ 68). Beyond the source's job title, plaintiffs fail to address how or why this employee would have had access to the information he or she alleges. They have not described with any kind of specificity the source's job description or responsibilities. See In re Daou Sys., Inc. Sec. Litig., 411 F.3d 1006, 1016 (9th Cir. 2005). Absent additional information, it is impossible for plaintiffs to support their contention that this source had advance access to the study's negative results, much less to support their theory that defendants possessed such knowledge.

The final anonymous source is a "clinical specialist" who reports that "the AiMI data arrived at the corporate headquarters in or about May of 2004." (Am. Compl. ¶ 83). Again, by including only this source's job title and this vague assertion, plaintiffs have failed to explain how this anonymous source actually knew of the arrival of the AiMI "data." Nor have plaintiffs pleaded with any particularity the content of this "data." The Court finds the Amended Complaint wholly fails to provide the level of detail

required to allow a Court to rely on anonymous sources in support of a PSLRA claim.

    2.  <u>Who, What, Where, When, and How?</u>

"Plaintiffs bear the burden of pleading sufficient facts to demonstrate that, at the time the statements were made, Defendants possessed information contrary to what they stated publicly." <u>Gaines v. Guidant Corp.</u>, 2004 WL 2538374, *8 (S.D. Ind.). Plaintiffs have not met their burden; they simply fail to identify the required "who, what, where, when and how" of the alleged fraud. <u>K-Tel</u>, 300 F.3d at 890.

The Amended Complaint neglects to identify who at Possis was aware of the negative "indications" concerning the AiMI study. The clinical representative speaks of "rumbling in the cath lab, people talking." (Am. Compl. ¶ 67.) According to the sales representative, "Those cases are gone over with a fine-tooth comb by the people over at Possis. To think they didn't know. . . . They knew. . . . Anybody would know." (Am. Compl. ¶ 68.) The clinical specialist simply alleges that "the AiMI data arrived at corporate headquarters." (Am. Compl. ¶ 83.) All three accounts leave the Court asking: who at Possis received the information? And even if the unidentified "they" knew, did they tell Possis' senior management?

Additionally, it is impossible to glean from the Complaint exactly what information was received at Possis. Plaintiffs'

sources speak of "indications" and "rumblings," but indications and rumblings hardly suggest defendants were aware of the study's actual results. Numerous questions are left unanswered regarding what was known to defendants: What was the source of the negative "indications"? Were the "indications" preliminary or final? How much of the study was affected? Plaintiffs' unnamed sources never disclose the words they heard, the documents they examined, or precisely who made the statements. As a result, the Court cannot establish whatever was known to the defendants prior to the announcement of the study results in August, 2004.

Not one of the accounts is specific enough to accurately establish when defendants acquired the claimed knowledge of the unsatisfactory results of the study. There is little relationship between the timing of the claimed misleading statements and the purported arrival of the AiMI study results at Possis. One employee says the "indications" and "rumblings" were received prior to April, 2004; another declares defendants knew the study was tending in a negative direction in "early to mid 2004." The third suggests the "data" arrived at Possis "in or about May of 2004."

It is plaintiffs who bear the burden of proof, and the concomitant burden to demonstrate a triable question of fact. In spite of this, they have not even established the date the full study was released. Absent a release date, how is a court to know whether any information was available prior thereto? There is

simply nothing in plaintiffs' pleadings establishing the date defendants received the full study results.

In sum, plaintiffs' unnamed-source accounts fail to meet the level of particularity demanded by the PSLRA's heightened pleading standards.   Absent some solid information, plaintiffs cannot provide the "who, what, where, when and how" called for in <u>K-Tel</u>, 300 F.3d at 890.

### 3.   <u>Safe Harbor</u>

Even if the Court accepts plaintiffs' claim that the actual results arrived at Possis around May, they have adduced no evidence showing how statements made prior to May could have been misleading, because the alleged advance information would not have yet arrived.   The only two statements made during or after May, 2004, are those made at the May 18 press release, and on the June 14 SEC 10-Q filing, and the Court finds these statements protected within the PSLRA's safe harbor.

The PSLRA's "safe harbor" provision protects "forward-looking statements" when "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1).   The statute explicitly includes "projection[s] of revenues, income (including income loss), [and] earnings (including earnings loss) per share," as well as "statement[s] of future economic performance" as inactionable forward-looking statements.   15 U.S.C. § 78u-5(i)(1)(A),(C),(D).

14

Possis' May 18, 2004, press release announced fiscal 2005 financial projections predicting AngioJet revenue in the range of $90-$96 million. But at the same time, the press release explicitly cautioned, "the upper end of the revenue range will require that the Company have compelling clinical results from its AiMI [clinical trial]." Id. The statements in this press release are exactly the type of statements protected by the PSLRA's safe harbor. The Company's projection of future revenue is accompanied by a meaningful cautionary statement – the figures are contingent upon compelling results from the AiMI study; if the results are not compelling, the AngioJet revenue will not be as high as projected.

The same is true of Possis' SEC form 10-Q, signed by Dutcher and Chacko, and filed on or about June 14, 2004. That form projected the same increased revenue for fiscal 2005, again cautioning: "[t]he upper end of the range will require that findings of the Company's AiMI coronary clinical marketing trial . . . support increased utilization of the AngioJet System." The form 10-Q estimated diluted earnings per share in the range of $.083 to $0.96, again qualified by the statement: "the upper end of the range [is] contingent on the impact of clinical results from AiMI." The 10-Q continues, "The Company expects to refine its guidance for fiscal 2005 once it has fully analyzed and disclosed the AiMI results." (Am. Compl. ¶ 81). Promising results were labeled "potential," and upper-end economic projections were

conditioned on positive study results. The company specifically informed the public that its SEC projections would be refined when the study results had been fully analyzed.

Even assuming Possis had received advanced results of the trial, these forward-looking statements are cautioned upon future performance and results. Such statements do not justify a principled conclusion that the defendants knowingly misled stockholders of the effect of the AiMI study on Possis stock prices. The Court finds such statements comfortably fall under the PSLRA's safe harbor provision.

B.  Scienter

In order to sustain a securities fraud action, plaintiffs must also show defendants' scienter. Under the PSLRA's stricter standard, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Thus, while a court ordinarily -- and previously -- assumed a complaint's factual allegations to be true under the PSLRA, a court now disregards catch-all or blanket assertions of scienter. Green Tree, 270 F.3d at 660.

In short, "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong.'" Id. PSLRA scienter may be established from facts demonstrating "the intent to deceive, manipulate, or defraud." Id. at 653. Evidence of

conduct "ris[ing] to the level of severe recklessness may [also] be sufficient to meet the scienter requirement." <u>K-Tel</u>, 300 F.3d at 893. Finally, evidence of motive and opportunity to defraud can also be relevant to the scienter analysis. <u>Id.</u> at 894.

Defendants claim plaintiffs' scienter allegations fail this test. The Court agrees. Plaintiffs have failed to establish scienter because they have not shown defendants acted either knowingly or recklessly. Finally, plaintiffs' proffered stock sales evidence fails to give rise to an inference of scienter.

### 1. <u>Knowing or Severely Reckless</u>

As discussed in detail above, plaintiffs have not established that any defendant received specific information on the AiMI study prior to issuing any of the purportedly false, misleading, or fraudulent statements. Though plaintiffs assert the reasonableness and strength of their hypothesis that the individual defendants must have had knowledge of the AiMI trial's negative outcome when it arrived at Possis, the allegations regarding the specificity of that information, and the timing of its arrival, are so inconsistent that plaintiffs' allegation cannot hold.

As above, where the Amended Complaint points to "indications" and "rumbling[s]" around Possis, none of plaintiffs' "sources" specifically attributes any knowledge of the AiMI study results to any individual defendant. Conclusory statements such as: "They knew. They had to have known," and "AiMI data arrived at the

17

corporate headquarters in or about May of 2004," do not suffice to prove defendants acted with scienter.

Plaintiffs ask the Court to engage in leaps of logic to find (a) that actual results of the AiMI study arrived at Possis in May; (b) that the impact of those results was fully realized immediately; (c) that the impact was instantly communicated to top management; and (d) that the defendants' ensuing statements were fraudulent. This is a gymnastic feat in which the Court is disinclined to engage. And particularly so when the net is supported by unreliable unnamed sources.

Unable to identify with particularity who at Possis was aware of the negative "indications" concerning the study's results, plaintiffs attempt to support their allegations of scienter simply by reciting defendants' positions in the company. There is no question that the individual defendants were Possis' CEO and CFO. Apparently, extrapolating from defendants' corporate positions, plaintiffs assert "it is reasonable to infer that key management personnel, including the individual Defendants . . . were aware of these negative indications." (Am. Compl. ¶ 70.) The Court rejects this purportedly "reasonable" inference. Such a conclusory allegation does not sufficiently bridge plaintiffs' gaps in logic. See In re Nash Finch Co. Sec. Litig., 323 F. Supp. 2d 956, 962 (D. Minn. 2004).

Upon analysis, plaintiffs have clearly failed to plead facts

which can support a finding that defendants acted knowingly, intentionally, or with severe recklessness concerning any of the alleged fraudulent statements.

   2. <u>Stock Sales</u>

   Plaintiffs point to seven of defendants' stock sales as evidence of scienter. But the reference is unavailing. "Insider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" <u>Navarre</u>, 299 F.3d at 747 (quoting <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1092 (9th Cir. 2002)). Additionally, "the insider trades have to be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved, before they will give rise to the required inference of scienter." <u>Id.</u> at 747 (quoting <u>Green Tree</u>, 270 F.3d at 659.

   Plaintiffs direct the Court to a number of seemingly large stock sales by company insiders over a 6-day period from May 27 to June 1 of 2004. But examination reveals that plaintiffs have failed to place these sales into any context from which the Court can properly infer the sales to be suspicious. The Amended Complaint alleges only the number of shares sold and the gross proceeds realized. (Am. Compl. ¶¶ 73, 77, 87.) Plaintiffs have

19

neglected to include the total number of shares held by each defendant.  Their Complaint says nothing of the general trading habits or prior history of sales of the insiders, except to allege that the sales during this class period were "unprecedented," and the most profitable sale for three of the insiders compared to previous years.  (Am. Compl. ¶ 87).

Absent more detail, the complaint fails to illustrate that these sales were dramatically out of line or unusual in timing or amount.  See K-Tel, 300 F.3d at 896; In re Synovis Life Tech. Sec. Litig., 2005 WL 2063870 at *17 (finding that it was "impossible to determine whether the sales were 'unusual in timing and amount,'" because the Complaint only alleged "the number if shares each executive sole and the gross profit realized).  Thus, these allegations cannot support an inference of scienter.

### 3.  Collectively, the Allegations are Insufficient

Allegations of scienter may be considered collectively.  Green Tree, 270 F.3d at 660.  And plaintiffs ask the Court to do so.  The problem is, however many times the Court adds zero to zero, the result is still nil.  Taken individually or in the collective, the Court discerns nothing here which meets the PSLRA standards.  As shown above, each of plaintiffs' proffered scienter allegations is insufficient.  All the allegations, taken as a whole, do not "support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading."  Adams v.

Kinder-Morgan, Inc., 340 F.3d 1083, 1099 (10th Cir. 2003).  The Court finds the plaintiffs' collective "indications" do not add up to scienter.

> C.   The § 20(a) claim

Plaintiffs' § 20(a) claim depends entirely on the merits of their § 10(b) and Rule 10b-5 claims.  As the Court finds those claims fail as a matter of law, the § 20(a) claim must also be dismissed.  E.g. Navarre, 299 F.3d at 748 ("[B]ecause the investors failed to present an actionable claim under 10(b) or 10b-5, the section 20(a) claim is not actionable.").

III.  Conclusion

"The purpose of [the Reform Act's] heightened pleading requirement was . . . to put an end to the practice of pleading fraud by hindsight."  Id. at 742 (internal quotations omitted). The Act performs its purpose well here; this case is a textbook example of fraud by hindsight.  Plaintiffs have failed to plead facts showing a misrepresentation of material fact or giving rise to a strong inference of scienter.  For that reason, the complaint fails to state a claim upon which relief may be granted under the pleading requirements of the PSLRA.

Plaintiffs request leave to amend the complaint, but there is no reasonable basis upon which to conclude that this complaint's defects can be cured.  Accordingly, it would be futile to grant leave to amend.  The complaint is therefore dismissed with

21

prejudice.   See K-Tel, 300 F.3d at 899.

    For all of the foregoing reasons, IT IS ORDERED THAT:

    Defendants' motion to dismiss the complaint [Docket No. 40] is granted.    Plaintiff's   Amended   Complaint   is   dismissed   with prejudice.

    LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 1, 2007


                              s/ James M. Rosenbaum
                              JAMES M. ROSENBAUM
                              United States Chief District Judge